IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ARSHAD YOUSUF, M.D.,                            )
                                               )
                        Plaintiff,             )
v.                                             )
                                               )
                                               )
GEORGE COHLMIA, M.D. and                       )
CARDIOVASCULAR SURGICAL                         )
SPECIALISTS CORP.,                             )
                                               )
                        Defendants.            )
                                               )        No.  09-CV-545-TCK (TLW)
and                                            )
                                               )
PHYSICIANS LIABILITY INSURANCE                 )
COMPANY,                                       )
                                               )
                  Intervenor/Plaintiff,        )
                                               )
and                                            )
                                               )
AMERICAN NATIONAL PROPERTY                     )
COMPANY,                                       )
                                               )
                        Garnishee.             )

## AMENDED OPINION AND ORDER[1]

Now before the Court is the Plaintiff's Motion for Summary Judgment Against Garnishee

American National Property and Casualty Company (Doc. 27), and the Motion for Summary

Judgment of Intervenor/Plaintiff, Physician's Liability Insurance Company, Against Garnishee,

American National Property and Casualty Company (Doc. 30).

---

[1]This Amended Opinion and Order corrects line 12 of page 28 in the prior Order and
Opinion (Doc. 56), entered May 28, 2010, to reflect that Garnishee, and not Intervenor/Plaintiff,
should be responsible for the entire cost burden of defending the interference claim.

## I. Background

Garnishee American National Property and Casualty Company ("ANPAC") issued two general commercial liability insurance policies to Plaintiff's judgment debtors, Cardiovascular Surgical Specialists Corp. ("CVSS") and CVSS employee, George Cohlmia, M.D. ("Cohlmia"). The policies are identical although each policy covers a separate business location. Intervenor/Plaintiff Physician's Liability Insurance Company ("PLICO") issued a separate professional liability insurance policy to CVSS and Cohlmia (collectively referenced herein as "Defendants").

On November 15, 2004, Plaintiff Arshad Yousuf filed suit against Defendants in state court for defamation, tortious interference with business relationships/contract, intentional infliction of emotional distress/tort of outrage, negligence, and breach of contract. Specifically, Plaintiff alleged that Cohlmia made false statements to local news media that disparaged Plaintiff's professional reputation. Cohlmia denied that the statements were false.

Defendants demanded, pursuant to the insurance policies, that ANPAC and PLICO defend the lawsuit. PLICO agreed to defend the lawsuit and did so under a reservation of rights. On May 4, 2005, PLICO notified ANPAC of the underlying action and demanded that ANPAC share in the defense. ANPAC refused to defend or share in the defense, essentially arguing that (1) no defamation claim triggered coverage; (2) the damages did not constitute bodily injury or property damage; and (3) such damages were excluded by the policies because they were "expected or intended from the standpoint of the insured." (*See* Mot. Summ. J., Doc. 27, ANPAC Letters dated June 29, 2005, Exs. 8, 9.) ANPAC further stated that, even if it erred in refusing to defend its insureds, PLICO had no right to contribution or indemnification.

Plaintiff disclaimed damages for defamation and filed an Amended Petition which omitted the defamation claim but kept the remaining four causes of action. At trial, Plaintiff offered evidence that the conduct of the Defendants affected him emotionally and physically in the form of headaches, stress, and upset stomach.  He took over-the-counter medications to alleviate those conditions. Before the case was submitted to the jury, Plaintiff withdrew his claims for breach of contract and intentional infliction of emotional distress.  The trial court instructed the jury on the two causes of action that remained:  negligence and intentional interference with business relationships.

Although Defendants requested specific verdict forms which would have required the jurors to specify the theory or theories of recovery forming the basis for their verdict, Plaintiff objected, and the trial court provided a general verdict form with special interrogatories.  The verdict forms did not allow for the allocation of any verdict into the competing theories of recovery.  On February 10, 2006, the jury found in Plaintiff's favor and awarded Plaintiff $5,000.000.  Jurors specifically found that Defendants acted in reckless disregard of the rights of others, and that Defendants acted intentionally and with malice towards others, but the jury awarded "-0-" dollars in punitive damages. The journal entry of  judgment was filed on March 8, 2006, and Defendants appealed.

After judgment was entered in the underlying action, Cohlmia commenced an action to require PLICO to pay the judgment against him, and Plaintiff commenced a garnishment action against PLICO to collect his judgment against Cohlmia, PLICO's insured.  On December 26, 2006, the trial court granted summary judgment to PLICO in both cases, essentially holding that PLICO had no obligation to pay the judgment. The parties dispute whether the trial court ruled on PLICO's obligation to defend the suit.  Nonetheless, PLICO continue to provide a defense pending appeal, subject to a reservation of rights, and it again tendered the claim to ANPAC for defense.  On April

3

10, 2007, PLICO also requested that ANPAC reimburse it for the costs it incurred in defending the suit. ANPAC again rejected PLICO's demand, arguing that the ANPAC policies excluded coverage for personal injury arising out of the publication of a defamatory or disparaging material when such publication was made by an insured with knowledge of the falsity thereof.

In this matter, Plaintiff claims that ANPAC is liable for payment of the damages assessed against Defendants because the actions of Defendants and the injuries suffered by Plaintiff are covered under the ANPAC policies. Plaintiff seeks to garnish the benefits available under the policies to Defendants. The policies provide coverage of $1,000,000 per occurrence or offense up to two occurrences or offenses in a policy year, and two independent policies for two business locations were in place at the relevant time. The policy limits for each policy are $2,000,000. Since each policy insured both CVSS and Cohlmia, Plaintiff argues, ANPAC is liable in the aggregate for $4,000,000 under the circumstances of this case. Plaintiff also seeks accrued post-judgment interest.

ANPAC generally denies that the damages awarded Plaintiff in the underlying tort suit are covered by the policies it issued to Defendants. Alternatively, ANPAC asserts that, even if coverage was afforded under the policies, Plaintiff would be limited to $2,000,000 and would not be entitled to costs or interest. Finally, ANPAC requests that, should the Court disagree with ANPAC's position, it should delay its decision pending appeal of a state court decision in the underlying action holding that the Plaintiff could not look to PLICO for indemnity under the terms of Defendants' policy with PLICO.

For its part, PLICO filed its Complaint in Intervention on October 15, 2009, seeking to recover its defense costs from ANPAC. ANPAC argues that PLICO cannot maintain an action for

contractual subrogation, equitable subrogation, or equitable contribution to recover defense costs. ANPAC also asserts that PLICO's claims are barred by the statute of limitations.

After the parties completed their briefing on the motions for summary judgment, the Oklahoma Court of Civil Appeals reversed the underlying state court judgment and remanded the matter for a new trial based upon an erroneous jury instruction regarding the tort of intentional interference with business relationships. The appellate court also reversed the judgment of the state court granting PLICO's post-trial motion for summary judgment. *Yousuf v. Cohlmia*, Case No. 104,090, at 13. (Opinion, filed  March 19, 2010) (unpublished).  Plaintiff's petition for writ of certiorari requesting review of the appeal by the Oklahoma Supreme Court was denied on May 24, 2010.[2]

The state appellate court's decision to reverse the judgment entered in state court and remand the matter for new trial does not render this matter of insurance coverage moot.  It does, however, affect the relief afforded, if any.  To the extent that Plaintiff and Intervenor/Plaintiff seek declaratory relief, the Court may act, but to the extent Plaintiff seeks garnishment for the amount of the state court judgment or post-judgment interest, the Court declines to act, as the underlying judgment has been vacated.[3]

---

[2] None of the parties provided the Court with a copy of the decision by the Court of Civil Appeals or briefed the effect of the decision on this matter in their trial briefs or proposed findings of fact and conclusions of law filed on April 29, 2010.

[3] Plaintiff filed a motion on May 26, 2010, seeking leave to amend the underlying Garnishment Summons to add a cause of action for declaratory judgment.  (*See* Doc. No. 54). The motion is moot, given the Court's opinion herein which is based upon the request for declaratory relief in the motions for summary judgment at issue and in PLICO's Complaint in Intervention (Doc. No. 23).  Accordingly, the Court sees no need to address the motion to amend.

5

## II.    Analysis

### A.    Standard of Review

Summary judgment is proper only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *e.g., Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009) (citations omitted). "Under Rule 56(c), the moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted). "Once this burden is met, Rule 56(e) requires the non-moving party to set forth specific facts showing there is a genuine issue for trial." *Id.* (citation omitted). Thus, "the moving party does not have the ultimate burden of persuasion at trial," but "it has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Id.* (citation omitted).

### B.    Insurance Contracts

Under Oklahoma law, the interpretation and construction of insurance contracts constitutes an issue of law for the court to determine and resolve. *E.g., Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991); *Torres v. Sentry Ins.*, 558 P.2d 400, 401 (Okla. 1976) (citation omitted). Parties may contract for risk coverage at will and are bound by the policy terms to which they agree. *Dodson*, 812 P.2d at 376 (citing *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974)). The terms of the policy, "if unambiguous, clear, and consistent," are construed so as to give

6

reasonable effect to all of its provisions, and these provisions are given their plain and ordinary meaning and import. *Id.* However, no "strained construction" or narrow focus upon any particular provision or term "will be indulged" so as to import a more favorable consideration to an insured. *Id.* To that end, courts do not rewrite policy language to extend coverage for a particular risk which is not intended to be covered. *See BP Am., Inc. v. State Auto Property & Cas. Ins. Co.*, 148 P.3d 832, 835-36 (Okla. 2005).

If the meaning of contract terms is uncertain, or the terms can bear more than one reasonable interpretation, the term is ambiguous and must be interpreted most favorably to the insured. *Dodson*, 812 P.2d at 376. Insurance policies, in particular, are considered "contracts of adhesion because of the uneven bargaining opposition of the parties," and the Court is to construe ambiguity or conflict in a policy strictly against the insurer. *E.g., Spears v. Shelter Mut. Ins., Co.*, 73 P.3d 865, 868 (Okla. 2003) (citation omitted); *Dodson*, 812 P.2d at 376 ("An insurance policy, like any other contract of adhesion, is liberally construed, consistent with the object sought to be accomplished, so as to give a reasonable effect to all of its provisions, if possible."). Oklahoma applies the doctrine of reasonable expectations "to the construction of ambiguous insurance contracts or to contracts containing exclusions which are masked by technical or obscure language or which are hidden in policy provisions." *Max True Plastering Co. v. United States Fidelity and Guar. Co.*, 912 P.2d 861, 863 (Okla. 1996). "Under this doctrine, if the insurer or its agent creates a reasonable expectation of coverage in the insured which is not supported by policy language, the expectation will prevail over the language of the policy." *Id.* at 864. In other words, "when construing an ambiguity or uncertainty in an insurance policy, the meaning of the language is not what the drafter intended it

7

to mean, but what a reasonable person in the position of the insured would have understood it to mean." *Spears*, 73 P.3d at 868.

### C.    Policy Coverage

The ANPAC policies provide coverage for the acts alleged by Plaintiff against ANPAC's insureds.  The subject policies state that ANPAC "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, property damage, or personal injury caused by an occurrence to which this insurance applies."  (Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4 at 13.)  The term "occurrence" is defined in the policies to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured and with respect to personal injury, the commission of an offense, or a series of similar or related offenses." (*Id.* at 21.)  The term "personal injury"

> means injury which arises out of one or more of the following offenses committed in the conduct of the named insured's business:
> a.       false arrest, detention, or imprisonment, or malicious prosecution;
> b.       the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right or privacy . . . or
> c.       wrongful entry or eviction, or other invasion of the right of private occupancy.

(*Id.* at 21-22.)  Plaintiff contends that the damages here occurred as a result of personal injury -- namely, business disparagement -- in a series of offenses evidenced by the numerous publications of disparaging material provided to the news media about Plaintiff.

ANPAC argues that coverage is not afforded under the personal injury portion of the policies because 1) the Plaintiff specifically disclaimed damages based upon defamation, and 2) the jury specifically found that Defendants acted intentionally and with malice towards others.  ANPAC

asserts that, although the policies cover damages for defamation, Plaintiff withdrew his defamation claim to avoid summary disposition based upon statute of limitations grounds.  Consequently, ANPAC argues, Plaintiff cannot base its claim for intentional interference with business relations on evidence of defamatory conduct because "a rose by any other name is still a rose."  (Resp. Br., Doc. 31, at 14.)

The Court finds ANPAC's reasoning flawed because, among other reasons, the tort of interference with business relationships is also known as disparagement.  *Cf. Royer v. Stoody Co.*, 192 F.Supp. 949, 953 (W.D. Okla. 1961).  As explained in *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W. 3d 167 (Tex. 2003), "[a] business disparagement claim is similar in many respects to a defamation action"; they differ "in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests." *Id.* at 170.  The ANPAC policies cover personal injuries caused by business disparagement as well as defamation.  (*See* Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4 at 21-22.)

The Tenth Circuit has explicitly held, interpreting Kansas law, that policy language referencing "the offense" of "the publication of . . . other defamatory or disparaging material" is broad enough to support coverage of certain claims for intentional interference with contract or business relations. *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F.3d 974, 981-82 (10th Cir. 1995).  Similar policy language led a Missouri court to find that a claim of tortious interference is included within the policy's definition of "offense" as a publication that disparages a person or organization. *McCormack Baron Mgmt. Serv., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999).  The *McCormack* court held that personal injury coverage of a commercial general liability (CGL) insurance policy for an offense that disparages a person's or organization's goods,

9

products, or services is not limited to the cause of action of disparagement or injurious falsehood, but can include a claim for tortious interference with a contractual relationship. *Id.* at 171.

The Court also finds that ANPAC's argument based on the jury's finding of intentional and malicious conduct by Defendants is misguided. First, the trial court's inclusion on the verdict form of these questions regarding such conduct was intended to inform the Court and the parties of whether the trial would proceed to a second stage for a determination of punitive damages. (*See* Pl. Mot. Summ. J. Doc. 27, Ex. 2, Jury Instruction No. 22.) Second, public policy does not prohibit the coverage afforded by the policies for intentional torts. This second point addresses ANPAC's position that the policies do not, and cannot, cover damages caused intentionally and maliciously because "common sense" and "public policy" preclude a wrongdoer from insuring against his own intentional and malicious conduct. ANPAC cites to Allen D. Windt, 1 *Insurance Claims and Disputes* 5th § 6:19 and 7 *Couch on Insurance* §101:22 for the general proposition that insurance coverage for an intentional act or willful misconduct is against public policy. ANPAC references *Pendergraft v. Commercial Standard Fire & Marine Co.*, 342 F.2d 427, 429 (10th Cir. 1965) and *Penley v. Gulf Ins. Co.*, 414 P.2d 305, 308 (Okla. 1966) to show that Oklahoma law is in accord. However, these two cases construed coverage for "bodily injury" under a homeowner's liability policy and "property damage" under an automobile liability policy. Such coverage is not at issue here.

The language of the commercial general liability policies at issue here preclude coverage for intentional conduct resulting in bodily injury or property damage, but they do not preclude intentional conduct resulting in personal injury. The policies define "occurrence" in the context of bodily injury or property damage as an accident "neither expected nor intended from the standpoint

10

of the insured"; they define "occurrence" in the context of personal injury as the commission of an offense. (*Id.* at 21.) Further, the definition of "personal injury" in the policy includes three types of offenses, all of which can be intentional torts. The policies specifically cover personal injuries caused by the publication or utterance of defamatory or disparaging material in the context of coverage for certain "offenses." (Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4 at 21.) The other offenses covered include "false arrest, detention or imprisonment, or malicious prosecution," as well as "wrongful entry or eviction or other invasion of the right of private occupancy." (*Id.* at 21-22.)

ANPAC nonetheless maintains that public policy prohibits the coverage provided by the policies for personal injuries. One of the leading treatises cited by ANPAC acknowledges that there are exceptions to the public policy against insuring for intentional or wilful conduct:

> Even though it may be against public policy to insure for an insured's intentional or willful conduct, some jurisdictions may find coverage for the conduct when the policy language specifically provides coverage for that conduct; a statute allows insurance for intentional conduct; or the court finds that the public interest in having victims compensated for their injuries, outweighs public interest in forcing the willful wrongdoer to pay the consequences of the misconduct.

7 *Couch on Insurance* §101.24 (footnotes omitted). As explained in *Grinnell Mut. Reinsurance Co. v. Jungling*, 654 N.W.2d 530 (Iowa. 2002), "[n]otwithstanding the general rule, 'a growing number of modern cases find the insured's intentional and similar conduct not to bar liability insurance coverage.'" *Id.* at 538 (citing *Couch* §101:24, at 101-84). The *Grinnell* court analyzed various factors used by various courts to determine whether public policy barred coverage of a loss due to an intentional tort (fraud) where the policy afforded broad coverage and had no intentional acts exclusion. 654 N.W.2d at 539-40. Here, the ANPAC policies exclude losses due to bodily injury or property damage due to intentional acts, but not losses due to personal injury. The *Grinnell* court concluded that there was no evidence that the availability of insurance coverage induced the

11

wrongdoer to engage in the intentional tort or that such coverage would encourage others to engage in similar conduct in the future.  *Id.* at 541.  Further, the court reasoned that compensating the wrongdoer's innocent victims outweighed the concern that the wrongdoer would unjustly benefit from coverage.  The court stated that "the ultimate and primary beneficiaries of the coverage will be innocent third parties" and the insurer "was in a far better position than anyone to protect itself by including an intentional-acts-exclusion provision in the excess policy."  *Id.*

Similarly here, there is no evidence to suggest that Cohlmia was induced to interfere with Yousuf's business relations because of the availability of insurance coverage, that permitting coverage would encourage other medical professionals to engage in similar conduct, or that Defendants obtained the ANPAC policies in contemplation of the alleged misconduct.  Further, the ultimate and primary beneficiary of the coverage is Yousuf, allegedly an innocent third party, and ANPAC is in a better position to include policy provisions excluding all intentional acts.  Instead, ANPAC included a policy provision which includes certain intentional acts resulting in personal injury.

Numerous courts, even in those jurisdictions which recognize the public policy precluding a wrongdoer from insuring against his own intentional misconduct, enforce similar provisions in general commercial liability policies permitting coverage for the intentional torts resulting in personal injury.  *See Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1310-11 (11th Cir. 2008) (Florida's public policy against insuring one's own intentional misconduct does not apply where liability is not predicated on intent.); *North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983, 986-87 (6th Cir. 1997) (Under Michigan law, umbrella insurance policy that contained definition of covered "personal injury" which included intentional torts and definition of covered "occurrences" which excluded

intentional torts containing studied ambiguity drafted by insurer, and thus would not be construed to cover only unintentional torts.); *Western Protectors Ins. Co. v. Shaffer*, 624 F. Supp. 2d 1292, 1301 (W.D. Wash. 2009) (Under Washington law, intentional act exclusion in homeowner's insurance policies did not bar coverage for claims based on insured's alleged invasion of privacy, even if all of insured's acts were intentional, where policies explicitly provided coverage for personal injury resulting from invasion of privacy.); *Butler v. Clarendon Am. Ins. Co.*, 494 F. Supp. 2d 1112, 1132 (N.D. Cal. 2007) ("Under California law, personal injury coverage applies to injury which arises out of the commission of certain enumerated acts or offenses; coverage is triggered by the offense, not the injury or damage which a plaintiff suffers."); *Freightquote.com, Inc. v. Hartford Cas. Ins. Co.*, 316 F. Supp. 2d 937, 941 (D. Kan. 2003) (Under Kansas law, coverage for personal and advertising injury under CGL insurance policy encompassed claims that insured tortious interference with contractual and business relationships.); *CIM Ins. Corp. v. Midpac Auto Center, Inc.*, 108 F. Supp. 2d 1092, 1099 (D. Haw. 2000) (Under Hawaii law, definition of personal injury in liability insurance policy was not limited to injury arising from enumerated torts, where policy stated that definition "also means" injury arising from enumerated torts; "also means" was term of expansion.).

Moreover, several jurisdictions specifically enforce provisions in general commercial liability policies permitting coverage for the intentional tort of defamation resulting in personal injury.  *See 12th Street Gym, Inc. v. General Star Indem. Co.*, 93 F.3d 1158, 1163 (3rd Cir. 1996) (Gym patron's claims for intentional and negligent infliction of emotional distress, invasion of privacy, civil conspiracy and defamation all stated potential claims for personal injury, such as defamation, under gym's liability policy.); *Waffle House, Inc. v. Travelers Indem. Co. of Ill.*, 114

S.W.3d 601, 612 (Tex. App. 2003) (Former employer's CGL policy required insurer to indemnify former employer for liability to former employee for mental anguish as a result of defamation, to former employee's personnel recruiting firm for lost profits from tortious interference with firm's contract with former employer's competitor, and to former employee and firm for punitive damages; the damages arose out of or resulted from the defamatory statements.); *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510, 108 Cal. Rptr. 2d 657, 664 (Cal. Ct. App. 2001) (Allegations that named insured's officers and employee told third persons that named insured's methods of doing business were flawed and would result in its failure and that the officers and employee made other representations that disparaged and damaged the named insured raised at least a potential for personal injury coverage for defamation and triggered the duty to defend under a CGL policy.); *McCormack Baron Mgmt. Serv., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999) (Alleged statement by real estate manager's employee informing security guard's supervisor of letter by guard and recommending discharge "disparaged" services as a security guard and was within personal injury coverage of manager's CGL insurance policy for an offense that disparages a person's services, even though guard's claim alleged tortious interference with contractual relationship.); *Maine State Academy of Hair Design, Inc. v. Commercial Union Ins. Co.*, 699 A.2d 1153, 1159 (Me. 1997) (Sexual harassment suit brought against insured by its former employee was potentially covered under provisions of insured's CGL policy affording "personal injury" coverage for disparagement and invasion of privacy, where complaint alleged that insured's extreme and outrageous conduct and discriminatory actions damaged her professional reputation.).

**D.     Policy Exclusions**

Further, the Court finds that coverage under the policies exists notwithstanding the exclusionary language of the policies. The relevant "Business Liability Exclusions" provide that the policies do not apply:

> "1. To bodily injury or property damage expected or intended from the standpoint of the insured. . . .
>
> 17. To personal injury arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any insured.
>
> 18. To personal injury arising out of any publication or utterance described in item b. of the Definitions of personal injury: . . .
>
>> b. concerning any organization or business enterprise or its products or services made by or at the direction of any insured with knowledge of the falsity thereof.

(Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4, at 14, 17.)

**1.     Exclusion 1**

ANPAC argues that some portion of the basis for the jury's verdict could have been for bodily injury because the jury was instructed that damages could be returned for negligently causing injury to Plaintiff and that they were to consider his physical and mental pain and suffering, past and future. ANPAC points to the evidence that Plaintiff took over-the-counter medications for his physical manifestations of emotional and mental distress. If the basis for the jury's verdict was bodily injury, ANPAC contends, coverage is excluded under the policies because it was "expected or intended from the standpoint of the insured." (Pl. Mot. Summ. J., Doc. 26, Exs. 3, 4, at 14.)

This argument fails because it is unreasonable to assume that bodily injury was the entire basis for the jury's award of five million dollars. Plaintiff's "headaches" and "stomach upset" were mentioned in eight lines of testimony during the course of a fourteen-day trial. Arguably, the

15

headaches and stomach upset do not rise to the level of bodily injury contemplated by the policy definition: "bodily injury, sickness, or disease sustained by any person which occurs during the policy period including death at any time resulting therefrom." (*Id.* at 20.)

Even if they did, however, there was no evidence at trial that ANPAC's insureds "expected or intended" to cause Plaintiff to experience bodily injury.  ANPAC admits that someone could negligently publish defamatory material and that is one of the allegations Plaintiff made.  ANPAC argues, however, that the jury finding of intentional and malicious conduct forecloses a finding of negligence here.  The Court disagrees.  The interrogatories regarding intentional and malicious conduct, like the interrogatory regarding reckless disregard for the rights of others, relate to the necessity for proceeding to a determination of punitive damages in the second stage of trial.  Indeed, the language of the interrogatories mirrors the language of jury instruction no. 22 regarding punitive damages.  The jury's intentional and malicious finding does not inform the Court of which theory the jury based its verdict for actual damages.  The exclusion for bodily injury is inapplicable.

### 2.    Exclusion 17

Similarly, the exclusion for "personal injury arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any insured" is inapplicable. ANPAC points out that libel and slander can be crimes or misdemeanors under 21 Okla. Stat. §§ 771 - 781.  Since the jury found that Defendants acted intentionally and with malice toward others by making disparaging remarks about Plaintiff, ANPAC argues, Defendants violated the penal statutes against libel and slander.  ANPAC further contends that, by the nature of the verdict, the jury rejected all defenses of the insured, including Defendants' defense of "truth" to the claim of intentional interference with business relations.  ANPAC points to authority stating that "[t]he

exclusion should be applicable even though the insured is not being sued for violation of a criminal statute, but only for civil remedies under a statute containing criminal sanctions," and further that, "[i]t could be argued that any civil statute providing for . . .damages is itself penal, and that, as a result, the exclusion is applicable when the insured's conduct is such that . . . damages are awarded." Allen D. Windt, 2 *Insurance Claims & Disputes* 5th, §11:28.

The Court is not inclined to read the exclusion so broadly. It is too big a stretch from the jury's finding that Defendants acted intentionally and maliciously, for purposes of finding punitive damages at the second stage of trial, to a finding that Defendant willfully violated a penal statute. The policies explicitly cover personal injury for "the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right or privacy . . ." (Mot. Summ J. Doc. 31, Exs. 3, 4 at 21.) To provide that coverage and then to exclude it in the same policy would be inconsistent. It renders the coverage provisions illusory and the exclusions ambiguous. The Tenth Circuit has read the same operative language in an insurance policy "to encompass claims other than libel or slander that involve the publication of 'defamatory or disparaging material.'" *Bankwest*, 63 F.3d at 979-80 (finding coverage for a claim of interference with business relations.) The special interrogatory in the verdict form with regard to whether Defendants acted intentionally and with malice toward others relates to the jury instruction on punitive damages, which were not awarded in this case. There was no jury instruction on defamation, as there was no claim for it, and the instructions on negligence and intentional interference with business relations contain no requirement that the jury find malice.

ANPAC cites to *Nat'l Fire Ins. Co. of Hartford v. NWM-Oklahoma, LLC, Inc.*, 546 F. Supp.2d 1238 (W.D. Okla. 2008) for the proposition that an insurance policy exclusion for violation

of a penal statute applies in a civil case where the injuries asserted "arise from acts which amount to a 'willful violation of penal statute,' . . . even if the elements of some of the legal theories upon which relief is sought in the civil suit differ from the elements which must be shown to establish a violation of the penal statute." *Id.* at 1249. The statute at issue in that case was the federal wiretap act, 18 U.S.C. §2510 *et seq.*, and other theories of relief included invasion of privacy and intentional infliction of emotional distress. The court noted that numerous courts addressing claims based upon the act and similar state wiretap statutes had concluded that such claims fall within the policy exclusion for willful violation of a penal statute. *Id.*

Here, there was no allegation that Defendants violated a criminal statute or that Plaintiff was entitled to civil remedies under a statute containing criminal sanctions. Further, the claims for injury from negligence or intentional interference with business relations do not arise from acts that necessarily establish a willful violation of the penal statutes for libel and slander. The jury's finding that the Defendants acted intentionally and maliciously, for purposes of considering whether to award punitive damages, does not necessarily imply that Defendants willfully violated a penal statute. There was no showing at trial that Defendants willfully committed, knew about, or consented to such violation. The mere fact that Cohlmia disparaged Yousuf does not mean that he, or his employer, willfully committed a crime.

### 3.    Exclusion 18

The third exclusion upon which ANPAC relies is for personal injuries arising out of any publication or utterance described in the definition of personal injury: . . . "concerning any organization or business enterprise or its products or services made by or at the direction of any insured with knowledge of the falsity thereof." (*See* Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4, at 17.)

18

This exclusion is inapplicable because Plaintiff is an individual person; he is not an "organization" or a "business enterprise."

Further, the jury did not find that Defendants knew the allegedly defamatory statements were false.  In fact, Defendants testified that they believed in the truth of their allegations.  (*See* Pl. Mot. Summ. J. Doc. 27, Ex. 11, Trial Tr. Vol. X. at 141-59.)  The jury was instructed that truth is a defense to intentional interference with business relations. (S*ee id.*, Ex. 2, Jury Instruction 16).  If the jury based its verdict on a finding that Defendants intentionally interfered with Plaintiff's business relations, they necessarily found that Cohlmia's statements were not true, but that does not equate with a finding that Defendants *knew* Cohlmia's statements were false when they were made.  Of course, the jury may have based its verdict on negligence, but the verdict forms do not indicate on which theory of recovery the jurors determined liability.  Knowledge of falsity is not an element or defense to negligence.  (*See id.*, Ex. 2, Jury Instructions 18, 19.)

Finally, contrary to ANPAC's arguments, a finding of malice is not equivalent to a finding of knowledge of falsity.  ANPAC points out that, in cases involving public figures, the burden of proving defamation claims is taken to a higher standard, requiring the plaintiff to prove "actual malice." *See, e.g., Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 659, 109 S.Ct. 2678, 2682 (1989); *Luper v. Black Dispatch Pub. Co.*, 675 P.2d 1028, 1033 (Okla. Civ. App. 1983) (citations omitted).  ANPAC reasons that, although Plaintiff was not found to be public figure, since the jury found malice, "it naturally follows that Plaintiff has reached the higher burden in a defamation case of proving malice."  (Resp. Br., Doc. 31, at 21.)

This rationale overlooks the fact that defamation was not a cause of action submitted to the jury in this case.  In addition, each case cited by ANPAC on this point indicates that proving a

statement was made with actual malice means proving that the statement was made "with knowledge that it was false **_or_** with reckless disregard of whether it was false or not." *Harte-Hankes*, 491 at 659, 109 S.Ct. at 2682 (citation omitted) (emphasis added); *see Luper*, 675 P.2d at 1033 (citation omitted); *see also Hervert v. Oklahoma Christian Coalition*, 992 P.2d 322, 327-28 (Okla. 1999); *Johnson v. Black Chronicle, Inc.*, 964 P.2d 924, 928 (Okla. Civ. App. 1998); *Miskovsky v. Oklahoma Pub. Co.*, 654 P.2d 587, 590-91 (Okla. 1982); *Brown v. Skaggs-Albertsons Prop., Inc.*, 563 F.2d 983, 987 (Okla. 1977). The jury in this case found not only that Defendants acted intentionally and with malice, but also in reckless disregard for the rights of others. (Mot. Summ. J. Doc. 27, Verdict Form, Ex. 12). Thus, under ANPAC's own reasoning, the basis for the malice finding could have been reckless disregard, and not knowledge of falsity.

The more important distinction is that both of the special interrogatories in the verdict form with regard to whether Defendants acted in reckless disregard for the rights of others or intentionally and with malice toward others relate to the jury instruction on punitive damages, which were not awarded in the second stage of the trial in this case. There is no language in the jury instructions regarding malice in relation to the theories of recovery or causes of action. The statement in the jury instruction regarding punitive damages is: "Malice involves either hatred, spite, or ill-will, or else the doing of a wrongful act intentionally without just cause or excuse." (Mot. Summ. J., Doc. 27, Ex. 2. at 28.) The exclusion in the policies for personal injuries arising out of any publication or utterance "concerning any organization or business enterprise or its products or services made by or at the direction of any insured with knowledge of the falsity thereof" does not preclude coverage in this case.

20

### E.     Amount of Coverage

ANPAC argues that, even if coverage is afforded under the policies, Plaintiff's suggestion as to the amount of coverage is incorrect.  The "Amended Declarations" page of each policy provides coverage, under "Coverage E - Business Liability," limited to $1,000,000 for "each occurrence" and $2,000,000 for an annual aggregate.  The policies define an "occurrence" to mean "with respect to personal injury, the commission of an offense, or a series of similar or related offenses." (Resp. Br., Doc. 31, Exs. 3, 4 at 21.)  ANPAC contends that the conduct and statements of its insured giving rise to Plaintiff's claims constitute a single occurrence, and as such, the per-occurrence policy limit applies.

Plaintiff argues that ANPAC's insureds uttered material harming Plaintiff using a variety of means over a period of time:  Defendants' acts occurred in person and in writing; they met with a newspaper reporter and with television reporters; and they contacted patients as well as Plaintiff's employers.  Thus, Plaintiff argues, the conduct was not simply one occurrence.  It was, however, "a series of similar or related offenses" and thus, an "occurrence" as defined in the policies. Accordingly, the Court finds that the per-occurrence policy limit applies, and the maximum ANPAC could be required to pay pursuant to the policies is $1,000,000 per policy.  Since there are two policies, ANPAC could be required to pay a total of $2,000,000.  The conduct of the parties did not constitute more than one "occurrence" as that term is defined by the policies.

A separate issue is whether ANPAC is liable for costs taxed against its insureds.  The policies provide, in relevant part:

The Company will pay, in addition to the applicable limit of liability:

* * *

2. all cost[s] taxed against the insured in any suit defended by the Company and all interest on the entire amount of any judgment [which] accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limits of the Company's liability.

(Resp. Br., Doc. 31, Exs. 3, 4 at 14.)  "The Company," ANPAC, argues that it has no obligation to pay costs or interest since it did not defend the underlying suit.

The fact is, however, that Defendants asked ANPAC to defend the underlying suit.  If the Court finds that ANPAC had a duty to defend, ANPAC is liable for costs.  Further, the policy provision does not make post-judgment interest contingent on the suit being defended by ANPAC.  Accordingly, if ANPAC is liable for damages, it is liable for post-judgment interest regardless of whether ANPAC defended the underlying suit or not.  The Court now turns its attention to PLICO's argument that ANPAC should have defended the suit.

**F.     Defense Costs**

The ANPAC policies provide that ANPAC has the "right and duty to defend any claim or suit against the insured seeking damages payable under this policy, even though the allegations of the suit may be groundless, false, or fraudulent."  ((Pl. Mot. Summ. J., Doc. 27, Exs. 3, 4,  at 14.)  The duty to defend is "separate from, and broader than, the duty to indemnify" and is "measured by the nature and kinds of risks covered by the policy as well as by the *reasonable expectations of the insured*."  *First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland*, 928 P.2d 298, 303 (Okla. 1996) (emphasis in original) (citations omitted).  "An insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise *to the potential of liability* under the policy." *Id.* (emphasis in original) (citation omitted); *cf. Conner v. Transamerica Ins. Co.*, 496 P.2d

22

770, 774-75 (Okla. 1972) (exclusionary clauses in policies did not relieve the insurer of the obligation to defend the insured in an action *charging* the insured with the conduct excluded; liability of the insurer would have been precluded only for an act or omission of the insured *adjudged* to be the type excluded by the policy.).

The Petition in this matter contained facts and allegations that gave rise to the potential of liability under the policies, even if ANPAC believed that its policies did not cover the claims and thus, that it had no duty to indemnify.  Defendants and PLICO notified ANPAC of the suit, setting forth plausible arguments that the Plaintiff's allegations, if true, would give rise to damages covered by the ANPAC policies.  Counsel for ANPAC admitted in a May 14, 2007 letter that the claims against Cohlmia "could conceivably fall under the terms of the business liability coverage as discussed in *Bankwest*," but argued that the policies excluded coverage for the type of injury alleged by Plaintiff.  (PLICO Mot. Summ. J., Doc. 30, Cole Letter, Ex. 5 at 4.)  In Oklahoma, "[a]n insurer who disputes the insured's demand to defend has three options.  It can (1) seek declaratory relief that would define the insurer's rights and obligations; (2) defend the insured under a reservation of rights, or (3) refuse to take any action at the peril of later being found in breach of its duty to defend."  *First Bank of Turley,* 928 P.2d at 304-05.  PLICO chose the second option, and ANPAC chose the third.

Given the allegations of the Petition and the language of the ANPAC policies, Defendants had a right to reasonably expect ANPAC to defend. *See, e.g.*, *Trammell Crow Residential Co. v. Virginia Sur. Co., Inc*., 643 F. Supp. 2d 844, 850-51 (N.D. Tex. 2008) (Underlying complaint alleged that insured committed enumerated "offense" under personal injury coverage, as required for insurer to have duty to defend under CGL insurance policy under Texas law, where entire

23

complaint rested on allegations of discrimination and it cited specific ways in which insured allegedly discriminated against persons with disabilities.); *National Union Fire Ins. Co. of Pittsburgh Pennsylvania v. Starplex Corp*., 188 P.3d 332, 347 (Or. App. 2008) (Liability insurers had a duty to defend company in civil rights actions as there were sufficient allegations in the complaints that, reasonably interpreted, gave rise to coverage for defamation claims under the personal injury coverage provisions of policies where plaintiffs alleged, among other things, that statements by insured's employees were intended to interfere with plaintiffs' business relations.); *Broom v. Continental Cas. Co.*, 887 A.2d 1128, 1133 (N.H. 2005) (Insurer owed insureds a duty to defend in defamation suit under "personal injury" coverage provisions business liability policy, as initial complaint alleged injuries from defamation by the insureds potentially within the scope of the policy coverage, even though insured's request for defense made shortly after filing of initial complaint was denied by insurer, and possibility that publication took place within the policy period was not foreclosed for over two years after filing initial complaint.).

### 1.     Reimbursement

A finding that ANPAC had a duty to defend, however, does not necessarily equate with a finding that ANPAC has a duty to reimburse PLICO for all of PLICO's defense costs.  PLICO asks this Court to assume that it was not obligated to provide a defense because the trial court ruled that it was not required to indemnify Defendants.  ANPAC argues that the trial court made no ruling as to whether PLICO had a duty to defend its insured in the underlying act.  In Plaintiff's garnishment proceeding against PLICO, the trial court merely stated that it agreed with PLICO "on all issues raised in the motions."  (*See* PLICO Mot. Summ. J., Doc. 30, Ex. 1, Journal Entry of Judgment.)

The appellate court reversed the judgment of the trial court.  While the appellate court did not address whether PLICO had a duty to defend, it noted the following with regard to the fact that the verdict forms fail to indicate under which theory, or combination of theories, the jury awarded damages:

> This is relevant to the two other appeals in this case because a judgment against Dr. Cohlmia based on a negligence theory would be paid by his professional liability insurance carrier as an act of negligence arising out of his professional actions.  A judgment against Dr. Cohlmia based on a theory of intentional interference with business relations would not be covered as that would arise from an intentional tort.

*Yousuf v. Cohlmia*, Case No. 104,090, at 4 n.1. (Opinion, filed March 19, 2010) (unpublished).  Consequently, PLICO had the duty to defend because the potential of liability existed with regard to Plaintiff's allegations of negligence.

The PLICO policy covers "'injuries' . . . arising out of the practice of the Insured's profession . . . ." (PLICO Mot. Summ. J., Doc. 30, Ex. 7, ¶ I.)  Further, the PLICO policy provides that PLICO "shall have the right and duty to defend any suit against the Insured seeking damages because of such injury even if the allegations of the suit are groundless, false or fraudulent."  *Id.*  The Policy defines "[o]ccurrence" to mean "any non-intentional act or omission by the insured, . . ." and "[i]njuries" to mean "personal injury," as well as "bodily injury, sickness or disease sustained by any person." (*Id.* ¶V.)  However, the PLICO policy also states that the insurance does not apply "[t]o payment of damages **(BUT WILL DEFEND)** in any claim for damages if said damages are in consequence of the performance of a criminal act or willful tort or sexual act."  (*Id.* at ¶ 1.H) (emphasis in original).  Thus, both PLICO and ANPAC were obligated to defend the negligence as well as the intentional interference with business relationship claims of the Plaintiff against the

Defendants, but only ANPAC had the duty to indemnify for a judgment on the interference claim, *i.e.*, the "willful tort."

The doctrines of contractual and equitable subrogation support PLICO's claim for reimbursement.  In *Brown v. Patel*, 157 P.3d 117 (Okla. 2007), the Oklahoma Supreme Court observed:

> Conventional (or contractual) subrogation is created by an agreement or contract between parties granting the right to pursue reimbursement from a third party in exchange for payment of a loss. *U.S. Fidelity and Guar. Co., v. Federated Rural Elec. Ins. Corp.*, 2001 OK 81, ¶ 9, 37 P.3d 828, 831.  Equitable subrogation allows a party who has paid to stand in the shoes of the party to whom the amount was owed and proceed against the third party primarily responsible for the amount paid. *Id.* at ¶ 10.  In both circumstances the subrogation is based upon payment.

*Id.* at 125.  The PLICO policy provides, in relevant part: "In the event of any payment under this policy, the company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization. . . ."  (PLICO Mot. Summ. J., Doc. 30, Ex. 6, § VII(E) at 6.)  This language gives PLICO the contractual right, upon payment, to seek recovery of defense costs as well any judgment Defendants obtain in this case.

ANPAC argues that PLICO's reliance on *Brown* and *U.S. Fidelity* is misplaced because ANPAC did not cause a loss to the insured and PLICO did not pay for a loss.  This argument misconstrues the loss at issue: it is not the judgment against Defendants; it is the cost of defending them.  "Subrogation is the substitution of one person in the place of another with reference to a lawful claim, demand or right." *Jorski Mill & Elevator Co. v. Farmers Elevator Mut. Ins. Co.*, 404 F.2d 143, 147 (10th Cir. 1968).  PLICO stands in the place of Defendants with reference to their

lawful right to demand that ANPAC defend the suit. ANPAC breached that duty, and PLICO suffered the "loss" of monies expended to defend the suit.[4]

The Court finds that PLICO is entitled to reimbursement, but it is not inclined to find that PLICO is entitled to full reimbursement, given that PLICO was also obligated to defend. PLICO argues that the entire cost should be borne by ANPAC because the trial court determined that PLICO's policy did not cover the claims asserted against Defendants. As set forth above, PLICO misunderstood the trial court judgment, and the appellate court's reversal of the judgment eliminates the basis for PLICO's argument. Since both parties had an obligation to defend both causes of action submitted to the jury, and the jury did not indicate the basis for its verdict, equitable principles suggest apportionment of defense costs evenly between the insurers.

The principles of equitable subrogation, in particular, would support such apportionment even if PLICO had no contractual right to subrogation. In *U.S. Fidelity and Guar. Co., v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001), the court addressed the doctrine of equitable subrogation as it pertains to liability for defense costs between an excess insurer and a primary insurer. The court explained that

> [e]quitable subrogation . . . arises by implication in equity to prevent an injustice. The . . . doctrine is based on the relationship of the parties and equitable principles of establishing substantial justice, and it is broad enough to include every instance where one person who is not a mere volunteer, pays a debt for which another is

---

[4] ANPAC spends a considerable portion of its response brief arguing that PLICO is not entitled to equitable contribution, but PLICO is not seeking equitable contribution. Equitable contribution is "the right to recover, not from a party primarily liable for the loss, but from a co-obligor or co-insurer who shares common liability with the party seeking contribution. The doctrine applies only when co-insurers have covered the same insured and the same particular risk at the same level of coverage." *U.S. Fidelity*, 37 P.3d at 832. PLICO and ANPAC cover the same insured, but the risks and coverage levels are not the same.

primarily answerable, and which in equity and good conscience should have been discharged by the latter.

*Id.* at 831. The court ultimately held that an excess insurer is not liable to the primary insurer under the doctrine of equitable subrogation for defense costs incurred prior to exhaustion of the primary policy. *Id.* at 835.

In this case, ANPAC is an excess insurer with regard to Plaintiff's claim for negligence, but not for intentional interference with business relations. The ANPAC policies provide: "If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not." (Mot. Summ. J. Doc. 27, Exs. 3, 4, at 27 ¶ 10.) The PLICO policy contains only a "pro rata" clause with regard to other insurance.[5] (*See* PLICO Mot. Summ. J., Doc. 30, Ex. 7, at ¶ VII.D.) The ANPAC policies covered the "same loss" as the PLICO policy with regard to Plaintiff's negligence claim. The PLICO policy limit is $5 million. Ironically, the judgment in the underlying action was also $5 million. The *U.S. Fidelity* court pointed out the conclusion of most courts that "the excess insurer is not responsible to participate in the costs of defense until after the limits of the primary policy are exhausted," or in other words, "the duty of an excess insurer to participate in the insured's defense is triggered only by exhaustion of the primary policy." 37 P.3d at 832-33. Since PLICO never paid or tendered the policy limits, ANPAC's duty to defend the negligence claim was never triggered.

---

[5] The PLICO policy provides, in relevant part: "If the Insured has other insurance against a loss covered by this policy, the company shall not be liable under this policy for a greater portion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss." (PLICO Mot. Summ. J., Doc. 30, Ex. 7, at ¶ VII.D.)

28

The intentional interference with business relations claim is another matter.  PLICO's policy does not cover intentional torts; ANPAC's policies do.  Under the doctrine of equitable subrogation, ANPAC should be responsible for the entire cost burden of defending the interference claim. PLICO's policy imposes a duty to defend the claim but not to pay any damages consequential to the performance of a willful tort.  It would seem patently unfair for PLICO to be responsible for defending the interference claim when the party ultimately responsible for damages on such a claim, ANPAC, was also obligated to defend it.  In summary, under principles of equitable subrogation, PLICO bears the defense costs of defending the negligence claim, and ANPAC should bear the defense costs of defending the intentional interference with business relations claim.  Since the jury did not apportion damages between the two theories, the only equitable apportionment of the defense costs in the underlying action is an even 50/50 split.

## 2.   Statute of Limitations

PLICO is entitled to the partial reimbursement set forth above, however, only if the statute of limitations has not run on its claim.  ANPAC argues that the applicable statute of limitations is three years under Oklahoma law for unwritten, implied-in-law contracts.  *See* Okla. Stat. tit. 12, § 95(2) (2001).  In *Republic Underwriters Ins. Co. v. Fire Ins. Exchange,* 655 P.2d 544 (Okla. 1982), relied upon by ANPAC, the court held that this three-year statute of limitations applied to an equitable subrogation action brought by one insurer against another for payment of an insurance claim. *Id.* at 546.  It did not address defense costs between primary and excess insurers, and it did not involve a claim of contractual subrogation.

Because PLICO's claim for reimbursement rests primarily on contractual subrogation, PLICO argues that the five-year statute of limitations under Oklahoma law for written contracts is

applicable instead.  *See* Okla. Stat. tit. 12, §95(3).  ANPAC's denial of coverage under the terms of its policies with Defendants gives rise to a cause of action for breach of contract, and PLICO, as Defendants' subrogee, claims reimbursement as damages for ANPAC's breach.  In *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252 (10th Cir. 1981), the Oklahoma five-year statute of limitations applied to the insureds' cause of action against their liability insurer alleging breach of contract for failure to defend, and the  "breach occurred when the insureds first incurred legal expenses because the insurer refused to defend them." *Id.* at 255.  Furthermore, the Tenth Circuit explained that the insurer's obligation to defend the insured continued throughout the third-party's litigation against the insureds. *Id.* The court held that "the insurer's continued refusal to defend the insureds constituted a series of breaches of its contractual obligations.  As the limitations period runs with each breach, the insureds are only precluded from recovering those litigation expenses incurred prior to limitations period, here, five years."[6]  *Id.* at 256.

PLICO's cause of action was first known to PLICO, according to ANPAC, when it placed ANPAC on demand for defense costs in May of 2005.  ANPAC rejected PLICO"s demands on June 29, 2005.  PLICO's filed its Complaint in Intervention on October 15, 2009, well within the applicable five-year statute of limitations period.  PLICO's claim for reimbursement is timely.

**III.    Conclusion**

For the reasons stated herein, Plaintiff's Motion for Summary Judgment Against Garnishee American National Property and Casualty Company (Doc. 27) is hereby GRANTED in part and

---

[6] Accordingly, if the three-year period of limitations period applicable to equitable subrogation claims were applicable, PLICO would be entitled to partial reimbursement for legal expenses incurred after October 15, 2006. Presumably, most of the expenses were incurred prior to that time, as the trial occurred in February, 2006.

DENIED in part.  It is granted to the extent Plaintiff seeks declaratory judgment; it is denied to the extent Plaintiff seeks an order compelling Garnishee to pay the amount of the judgment in the underlying case, as the underlying judgment has been vacated in state court.  Further, the Motion for Summary Judgment of Intervenor/Plaintiff, Physicians Liability Insurance Company, Against Garnishee, American National Property and Casualty Company (Doc. 30) is hereby GRANTED in part and DENIED in part.  It is granted to the extent PLICO seeks declaratory judgment; it is denied to the extent PLICO seeks an order compelling Garnishee to reimburse PLICO for the full amount of PLICO's defense costs in the underlying suit.  As discussed herein, PLICO is entitled to partial reimbursement only.

   **SO ORDERED this 3rd day of June, 2010.**


**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**